**UNITED STATES of America, Plaintiff,**

**and**

Richard Ganaway, II, a minor, by his father and next friend Richard Ganaway; Renee Gadsden, a minor, by her father and next friend Raymond Gadsden; Tarsha Lucas, a minor, by her mother and next friend Catherine Williams; Stacy Brown, a minor, Rotissa Renee Brown, a minor and Uganda Brown, a minor, by their mother and next friend Louise Brown; Michelle Buggs, a minor, and Charlton Ancrum, a minor, by their father and next friend Henry Vernon Ancrum; Bernard Simmons, a minor, by his mother and next friend Idell Simmons; David Bonneau; Annette Bonneau, a minor, and Sharon Bonneau, a minor, by their mother and next friend Lorraine Bonneau; Mona Lisa Lockhart, a minor, Dexter Smith, a minor and Lichelle Lockhart, a minor, by their mother and next friend Marthenia D. Lockhart, Plaintiffs–Intervenors,

v.

CHARLESTON COUNTY SCHOOL DISTRICT and State of South Carolina; and Charlie G. Williams, Superintendent, State Board of Education; Abraham Funchess, Joseph D. Parker, R.B. Gentry, T.C. Kistler, John R. Stevenson, Lucy B. Hayes, Creighton G. Edwards, Joyce Wimmer, Howard F. Burky, Jack F. McIntosh, Robert E. Livingston, Jessie B. Schoolfield, W. Buford Estes, Louis O. Dore, Anne K. Collins, Wilbur F. Smith, Jr., and Dolphus Carter as member of the State Board of Education; Richard W. Riley, Governor and Chairman; Thomas G. Magnum, Marion Gressette, Earl Morris, and Grady Patterson as a member of the State Budget and Control Board, Defendants.

Civ. A. Nos. 2:81–0050–8, 2:82–2921–8.

United States District Court,
D. South Carolina,
Charleston Division.

June 5, 1990.

the Charleston County school system operates today, violates the Equal Protection Clause of the Fourteenth Amendment. After very lengthy discovery, due to the nature of the case, and after deciding to bifurcate the liability and damages aspects of the case, evidence on the liability issue was taken non-jury on various dates, beginning on October 6, 1987, and ending on September 27, 1988. Final briefs were submitted to the court in November of 1989. For the reasons stated within, this court has concluded as a matter of fact that the aforesaid Act was passed without discriminatory intent. Although this court finds that the Act was passed without discriminatory intent, this court does find that the Act has had a limited discriminatory effect in the operation of the schools in Charleston County. The court further finds as a matter of law that both discriminatory intent and discriminatory effect must be established to prove a Fourteenth Amendment violation. Because the plaintiffs can have no remedy unless the passage of the Act was enacted with discriminatory intent *and* the Act has a discriminatory effect, and for the other reasons hereinafter stated, the complaint herein must be dismissed.

Jeremiah Glassman, Dept. of Justice, Washington, D.C., Arthur McFarland, Charleston, S.C., and Thomas J. Henderson, Pittsburgh, Pa., for plaintiff.

Travis Medlock, Atty. Gen., State of S.C., Columbia, S.C., Robert Rosen and Alice F. Paylor, Charleston, S.C., for defendants.

## ORDER

BLATT, District Judge.

The plaintiffs instituted this desegregation action on January 9, 1981, alleging, basically, that the 1967 Act of the South Carolina General Assembly, under which

## I. INTRODUCTION

The plaintiff, United States of America, and the plaintiff-intervenors, Richard Ganaway et al., on behalf of all black children in Charleston County, South Carolina, are suing the Defendants, Charleston County School District and State of South Carolina.[1] Plaintiffs assert that the defendants have refused and/or failed to dismantle the dual school system in Charleston County; that the present situation, in which there remain all-black schools, results from intentionally discriminatory legislative and administrative actions taken by

---

1. "Plaintiff" refers to the United States of America, the original Plaintiff in this action. "Plaintiff–Intervenors" refers to Richard Ganaway, II, a minor, by his father and next friend Richard Ganaway; Renee Gadsden, a minor, by her father and next friend Raymond Gadsden; Tarsha

Lucas, a minor, by her mother and next friend Catherine Williams; Stacy Brown, a minor, Rotissa Renee Brown, a minor and Uganda Brown, a minor by their mother and next friend Louise Brown; Michelle Buggs, a minor and Charlton Ancrum, a minor, by their father and next

the defendants; and that the acts and omissions of the defendants in managing the public school system have had discriminatory effects, all in violation of defendants' affirmative duty to desegregate the Charleston County School District.

Defendants assert that the legislative and administrative acts taken by them were not intentionally discriminatory, and that they have completely dismantled the former *de jure* dual school system in Charleston County. Defendants, therefore, request the court to dismiss this action and to declare that the Charleston County School system has achieved unitary status.[2]

## II. PROCEDURAL HISTORY

Litigation concerning racial segregation in the public school systems of Charleston County began in 1962 with the filing of the Complaint in *Brown v. School District No. 20, Charleston, South Carolina*, 226 F.Supp. 819 (E.D.S.C.1963), *aff'd*, 328 F.2d 618 (4th Cir.1964) *cert. denied*, 379 U.S. 825, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964). That complaint was filed to enjoin the City of Charleston school system—(District 20)—from operating on a racially segregated basis in violation of the United States Constitution, as prohibited by the decision of the United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Prior to 1954, pursuant to the South Carolina Constitution and statutes, schools in South Carolina were required to be racially segregated. *Brown* declared such *de jure* systems

of segregation to be an unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment. This landmark decision led to a vast number of suits seeking compliance with the Supreme Court's mandate. The District 20 case was one of those suits. At the time, District 20 was one of eight separate school districts in Charleston County.

The District 20 case was commenced in 1962 by thirteen black students and their parents on behalf of themselves and others similarly situated, for an injunction enjoining the operation of the school system in District 20 on a racially segregated basis. The district court issued its first order in that case on April 11, 1963, and retained jurisdiction over the matter until that case was dismissed by order dated July 31, 1981. CCSD Ex. 18.

Effective July 1, 1968, the Charleston County School District was created pursuant to Act 340, *Acts and Joint Resolutions of the General Assembly of the State of South Carolina* (1967)—(hereinafter referred to as "Act 340")—and certain powers, primarily fiscal and administrative, previously held by the eight separate districts, were vested in it. CCSD Ex. 15. However, the eight former school districts were denominated as "Constituent Districts" and retained their authority over faculty employment, student assignment and student discipline.

On January 9, 1981, the United States filed the instant complaint, alleging that

friend Henry Vernon Ancrum, Bernard Simmons, a minor, by his mother and next friend Idell Simmons; David Bonneau; Annette Bonneau, a minor and Sharon Bonneau, a minor, by their mother and next friend Lorraine Bonneau; Mona" Lisa Lockhart, a minor Dexter Smith a minor and Lichelle Lockhart, a minor by their mother and next friend Marthenia D. Lockhart. The court will utilize the word "plaintiffs" when referring to the "plaintiff and plaintiff-intervenors" together. The defendant Charleston County School District will be referred to as "CCSD," the defendant State of South Carolina and other State Defendants as "the State," and the two together as "the defendants."

**2.** Citations to the evidence are noted as follows: "CCSD Ex. 1" refers to Defendant Charleston County School District's exhibit number 1, "State Ex. 1" refers to Defendant State of South Carolina's exhibit, number 1. "U.S. Ex. 1" refers to Plaintiff United States' exhibit number 1. "P–I Ex. 1" refers to plaintiff-intervenors exhibit number 1. Citations to trial testimony refer to the witness giving such testimony, the day of the trial (and transcript) and the page number of his or her testimony. Thus, "Armor, day 32, p. 101" refers to Dr. David Armor's testimony on page 101 of the transcript for day 32 of the trial.

"[t]he public schools in Charleston County are substantially segregated by race"; that the "racial segregation ... is the result of intentionally discriminatory legislative and administrative actions by the defendants"; and that "Sections 7 and 8 of [Act 340] were enacted with the purpose, and have had the effect, of discriminating against students in the Charleston County public schools on account of their race and segregating such schools by race." Complaint of United States, Paragraphs 6, 7 and 15.[3]

Defendants moved to dismiss the complaint, and the case was stayed for several years to allow the parties to negotiate. In the fall of 1983, this court denied the defendants' motions to dismiss and allowed the plaintiff-intervenors to intervene in the action. The complaint in intervention set forth substantially the same allegations as were set forth in the United States' complaint.

The trial commenced on October 6, 1987. After nine days of testimony from 28 witnesses, the United States completed the presentation of its case on November 10, 1987. The plaintiff-intervenors then presented nine days of testimony from 20 witnesses. After the plaintiffs rested, the defendants moved to dismiss pursuant to Rule 41(a) of the Federal Rules of Civil Procedure. The court denied defendants' motion after hearing arguments on May 2, 1988. Thereafter, the CCSD began the presentation of its defense on June 14, 1988, and concluded on September 27, 1988 after 15 days of testimony from 32 witnesses. The State, relying upon its exhibits and the evidence in the record, presented no witnesses and concluded its case the same day. After one plaintiff-intervenors' witness offered rebuttal evidence, the evidence-taking portion of the trial concluded on September 27, 1988.

## III. THE ISSUES BEFORE THE COURT

The primary legal issue before the court is whether the CCSD and the Constituent Districts have fulfilled their affirmative duty to eliminate the former dual school system in Charleston County. In deciding this issue, the court must consider at the outset the validity, interpretation and effect of Act 340, the principal statute governing public education in Charleston County. Specifically, the court must decide:

1. Whether Act 340 was enacted with a discriminatory purpose;

2. Whether Act 340 has had a discriminatory effect; and

3. Whether the CCSD and the Constituent Districts have properly interpreted Act 340 in carrying out their respective affirmative duties to eliminate all vestiges of the former dual school system in Charleston County.

Plaintiffs contend that Act 340 was passed with discriminatory intent and has a discriminatory effect, thereby violating the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs urge this court to find Act 340 to be unconstitutional in that it prevents the CCSD and the Constituent Districts from eliminating the former dual school system. Only after the court has decided these threshold issues will it be

---

3. Sections 7 and 8 of Act 340 provide as follows, in pertinent part:

**Power of trustees in constituent districts.—** The trustees in each of the constituent districts shall have the power, subject to the appeal to the the Board of Trustees of the Charleston County School District in the matter provided in Sections 21–247 *et seq.* of the Code of Laws of South Carolina, 1962 [now codified as § 59–19–510, *et seq.* of the 1976 Code]:

(1) To transfer any pupil from one school to another within the same constituent district so as to promote the best interest of education, and determine the school within such constituent district in which any pupil shall enroll;

(2) To suspend or dismiss pupils when the best interest of the schools makes necessary;

....

Section 8 provides:

**Approval of teachers required prior to transfer**—No teacher or other professional employee shall be transferred from one constituent district to another without the approval of such employee, the Board of Trustees of the Charleston County School District, and the trustees of each of the constituent districts involved.

able to decide the central issue in the case of whether the CCSD and Constituent Districts, acting under applicable state and federal law, have dismantled the former dual school system in Charleston County.

## IV. GOVERNING LEGAL PRINICIPLES

Before delving into the specific factual and legal findings and conclusions necessary to the disposition of this action, the court finds it expedient to examine the basic principles of law regarding school desegregation actions.

## A. DUTY TO DESEGREGATE

Until 1954, the public schools of South Carolina, including Charleston County, were segregated by race, with separate schools for black and white students mandated by state law. In 1954, the Supreme Court in *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686 (1954), held that such dual school systems violated the Equal Protection Clause of the Fourteenth Amendment. The following year, the Supreme Court decided *Brown v. Board of Educ.*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*), in which it held that school boards operating such dual school systems were required "to effectuate a transition to a racially nondiscriminatory school system." 349 U.S. at 301, 75 S.Ct. at 756. In discussing the *Brown II* mandate, the Supreme Court, in *Green v. County School Bd. of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), held:

> Brown II was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.

391 U.S. at 437–38, 88 S.Ct. at 1694. The objective in carrying out this affirmative duty is to eliminate all vestiges of segregation found in the dual school system. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). When the dual systems are eliminated, "further judicial supervision over the school system is unnecessary unless school authorities deliberately attempt to segregate the schools...." *Martin v. Charlotte–Mecklenburg Bd. of Educ.*, 626 F.2d 1165, 1167 (4th Cir.1980); *Riddick v. School Bd. of City of Norfolk*, 784 F.2d 521 (4th Cir.1986); *Whittenburg v. School Dist. of Greenville County*, 607 F.Supp. 289 (D.S.C.1985).

■ i. *Burden of Proof.* In deciding whether defendant CCSD has fulfilled its duty to desegregate, the court first must consider the allocation of the burden of proof between the parties. As a general proposition, until a former dual school system becomes unitary, "plaintiffs are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants." *School Bd. of the City of Richmond v. Baliles*, 829 F.2d 1308, 1311 (4th Cir.1987). However, in seeking to show that current disparities exist in the CCSD, plaintiffs contend, among other things, that this court should disregard Sections 7 and 8 of Act 340 on the grounds that such sections were enacted with a discriminatory purpose, have a discriminatory effect, and are, therefore, unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. Since public education in Charleston County is largely governed by Act 340, its allocation of authority between the CCSD and Constituent Districts must be taken into account in determining whether the CCSD has fulfilled its affirmative duty. Thus, the validity and binding effect of that Act must be determined before the court can decide the ultimate issue in the case, namely, whether CCSD has fulfilled its affirmative duty to desegregate.

■ The issue arises as to which party has the burden to prove that Act 340 was

enacted with discriminatory intent and a resultant discriminatory effect. The court concludes that plaintiffs bear the burden of proof on this issue. Act 340 is not a policy or rule which has been adopted by the CCSD in the exercise of its discretion. It is a duly enacted statute of the State of South Carolina and, as such, is presumptively valid. *See, e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)—(legislative acts have a presumption of constitutionality). Therefore, unless and until such statute is proven to be unconstitutional, the CCSD is bound by its requirements just as any citizen is bound by valid state law. To the extent plaintiffs contend that Act 340 is unconstitutional, and can therefore be disregarded in evaluating the CCSD's present desegregation plans and their results, plaintiffs bear the burden of establishing that the statute is unconstitutional.

## V. ACT 340: ITS HISTORY AND CONSTITUTIONALITY

In 1967, State Senator Charles M. Gibson of Charleston County introduced Act 340, which proposed to consolidate all eight of the school districts in Charleston County, although the Act as passed left with the existing districts the power to make student and teacher assignments. Plaintiffs contend that the South Carolina General Assembly structured this school system with the intent to allow the schools of Charleston County to remain as segregated as possible.[4] Plaintiffs further contend that defendants have improperly interpreted Act 340 in a manner that avoids their affirmative duty to desegregate Charleston County schools.

Defendants counter that the consolidation was intended to help equalize the ex-

tremely divergent tax bases in the several districts, and that the retention of the previously existing boundaries for student and teacher assignments was a concession to those legislators who either did not want any local control taken away from the eight school districts, or who opposed "spreading the wealth" between the wealthy and the very poor districts.

### A. INTENT

An integral part of plaintiffs' argument is that the General Assembly intended to perpetuate segregation by the passage of Act 340; therefore, this court must first examine the evidence on this issue. The court heard extensive testimony and received numerous exhibits concerning the intent of the General Assembly in passing Act 340, the "consolidation act", on which plaintiffs' constitutional challenge is based.

In January, 1967, when Senator Gibson introduced his bill to consolidate the school districts of Charleston County, the evidence clearly indicates that the eight Charleston County school districts were operating with substantially different amounts of funding due to their different tax bases. See, for example, Frampton, day 21, p. 51, Gibson, day 25, p. 82. Several studies had been conducted concerning the Charleston County schools; one in 1966 by the State Board of Education, and another, also in 1966, authorized by the South Carolina General Assembly. Both of these studies resulted in various recommendations of ways in which, among other things, education could be improved in Charleston County schools. Both studies recommended consolidating the school districts in order to equalize funding among all the districts. CCSD Ex. 16, pp. 85–86, p. 102; Smythe, day 24, p. 9, CCSD Ex. 39, p. 119 and cover letter, pp. 6–8. Senator Gibson, following the suggestions contained in these reports, introduced

---

4. In 1951, Charleston County was comprised of twenty-one (21) separate school districts. In the fall of 1951, the Charleston County Board of Education consolidated the 21 districts into the 8 districts that today exist as "Constituent Districts". Plaintiffs contend that the consolidation in 1951 was effected to keep Charleston schools as segregated as possible in anticipation that

dual school systems would some day be found unconstitutional. The court finds no reasonable evidence to support plaintiffs' contention. This finding is bolstered by the fact that both plaintiffs concede that each constituent district itself is a desegregated as it can be, given Charleston's geography and large number of private schools, as further elaborated, *infra.*

his version of the bill in January, 1967. At that time, the rural school districts, 1, 9 and 23, were barely able to maintain their educational programs due to the low levels of tax revenues raised in those districts.

The Gibson bill was extremely controversial, in both the public and political arenas. The Republicans in the House and the Senate, as well as many citizen groups, opposed it, both of which felt that loss of complete local control over the schools in each existing district would greatly damage the educational structure in the individual districts. Residents of North Charleston, the district with the largest tax base, opposed the bill, because they correctly perceived that their taxes would increase and their services would decrease. Residents of Districts 4 and 10 opposed the consolidation because they were the ones upon whom the greatest increase in taxes would be imposed. CCSD Ex. 17A, pp. 55, 57. Amendments were offered to the bill which continued local control over, among other things, faculty hiring, student assignments and student discipline. These amendments designated the eight former districts as "Constituent Districts," continuing in them the same boards of trustees and the same authority over pupil assignments, teacher hiring and the suspension and dismissal of students. After a long and heated legislative battle, Act 340, in its amended form, was passed in June, 1967, to be effective the following year.

Evidence does exist that some opposed the consolidation solely for racial reasons. However, the court finds that there were many legitimate reasons, not connected with race, which caused citizens and those involved in the political process to oppose Act 340. As Senator Gibson testified at trial, he was aware of the opposition to his "total consolidation" bill for both fiscal and racial reasons. He ultimately accepted the House version of his bill, which provided for the current "Constituent District" control, not because of the changes it did make—regarding teacher and pupil assignment—but because of the changes it did not make—it left the fiscal equalization aspects of his original bill intact. Gibson, day 25, pp. 99–100, 129–30.

Plaintiffs contend that the amendments to Act 340, which created the Constitutent Districts, were primarily designed to placate the racial concerns of those who opposed the bill. Such a system, they aver, would maintain segregation by keeping students in schools in their respective neighborhoods. The court finds, however, that any legislator who could possibly be identified as having racial concerns, opposed both the original bill providing for complete consolidation and the amended drafts of the bill. Therefore, the court finds as a matter of fact that the amendments creating the Constitutent District system were not added to Act 340 to appease any legislator or citizen group whose avowed purpose was to maintain the dual school system. As is often the case, the final Act was the result of a political compromise based on the perception of the members of the House of Representatives and some Senators that the retention of the local boards in a county as large as Charleston would prove useful and important to the functioning of the school district and would also appease some of the legitimate opposition to the bill. It was, essentially, an attempt to preserve local control and still gain the absolutely necessary positive benefits of a single, consolidated tax base for the entire county. Figg, day 22, p. 44; McGee, day 23, p. 84; Scarborough, day 23, p. 142; Hartnett, day 23, p. 173; Gibson, day 25, p. 130; Guerard, day 6, p. 114.

The plaintiffs contend that Section 7, which sets forth the powers of the Constituent Districts, and Section 8, which sets forth the procedure for the transfer of teachers, of Act 340 are unconstitutional because these sections were enacted with a discriminatory purpose, they have had a discriminatory effect, and they have hindered and impeded desegregation in Charleston County. The court finds, however, that the evidence simply does not support this contention; rather, the evidence overwhelmingly proves that the purpose of the Act as passed was to equalize funding throughout the County and to remedy the economic disparities which existed

between districts. The powers vested in the Constituent Districts, including responsibility for student assignments and faculty hiring, were never granted to the CCSD, but were left with the eight existing districts, which were designated as Constituent Districts in the Act.

### B. EFFECT

Plaintiffs' second contention concerning Act 340 is that its passage and implementation by defendants has had a discriminatory effect in that it has allowed a dual school system to be continued in Charleston County. This court is convinced that it is slightly more difficult to further integrate Charleston County schools today because of the constituent districting provided for in Act 340. If the Constituent Districts did not exist, and the county system were operated as one district, as the plaintiffs urge, the court finds that the pupils could be assigned in a somewhat different manner, thereby causing the racial composition of some schools to be more racially balanced. Thus, if sections 7 and 8 were deleted from Act 340, and the Act were interpreted as consolidating the entire county of Charleston for all purposes, the court feels that a relative few of the schools in Charleston County would be less segregated, and, to that extent, the court finds that Act 340 has had a slight *effect* of hindering further desegregation. The General Assembly, if it had so chosen, could have "started from scratch" and drawn up completely new attendance zones and districts, and the court finds that the retention of the pre-existing constituent attendance zones does have some slight effect of preventing further desegregation in Charleston county. However, as elaborated *infra,* this court does not feel that the adoption of a new plan of organization for Charleston County schools, which plan's sole purpose was for fiscal equalization, is tantamount to a disregard of the affirmative duty under *Brown* and its progeny to eliminate all vestiges of segregation.

While it may be slightly more difficult to achieve a greater measure of desegregation within the existing legislative framework than could be acheived without the Constituent District system, true integration would be impossible in Charleston County because of its rather unique geography. With all of its rivers and bridges and its nearly 100 mile area, extensive busing would be extremely dangerous. The court further finds, based on the testimony of Dr. Armor and Dr. Clark, expert witnesses in this case, that, given housing patterns, natural obstacles, and the transportation system of Charleston County, it would not have been practical to draw the school attendance zones in a manner which would increase in any significant respect the level of integration in the schools, even if Constituent District lines were completely disregarded. Both Dr. Armor and Dr. Clark investigated the school attendance zones and enrollments to determine whether more desegregation could have been achieved if the Constituent District boundary lines were disregarded in establishing school attendance zones. Although both identified a few areas where they believed zone changes prior to 1980 might have improved racial balance in a some schools, both were of the opinion that such changes would not have any significant effect on overall levels of desegregation. Armor, day 32, pp. 93–99; Clark, day 26, pp. 116 117. Based on his examination of attendance zones, Dr. Armor concluded:

> [t]here is very, very little that I think could be done if we ignored those boundaries or that would be done or at least would have been done by, the districts, because there really aren't very many adjacent districts across the rivers or the boundaries that have-would be the right mix of majority white with majority black, which if you then rezone them or combine them, you would have a substantial improvement in desegregation.

Armor, day 32, pp. 94–95.

Dr. Armor did identify several areas in which better racial balance might have been achieved as of 1980 if the attendance zones between the schools could have been drawn without reference to Constituent District lines. First, the attendance zones of Orange Grove Elementary, a majority white school in District 10, and Mary Ford

Elementary, a predominately black school in District 4, might have been adjusted to achieve more racial balance in those schools. Second, Stiles Point Elementary, a predominately white school in District 3, and James Simons Elementary, a predominately black school in District 20 across the Ashley River, could theoretically have been combined. Third, he considered the possibility of merging District 20 schools with District 2 schools which would necessarily involve transporting students across the Cooper River. However, while these combinations were theoretically possible, Dr. Armor emphasized that if boundary lines were extended across rivers and bridges, as they would be in the three situations he described, white students would not "show up," causing "white flight". Dr. Armor testified:

I looked at the possibility of going across, the Cooper River in District 2, but I am—I'm going to make the same comment about these other combinations. I think when you change, the boundaries within the district, that's one thing, adjacencies or close by. I think when you change boundaries across rivers and bridges where there are a lot of obstacles in the way, I think that you will have a danger that white students that were assigned to black schools in District 20 and maybe black students assigned to cross the river to District 2 would not show up and you would have the phenomena we know as white flight.

I don't think that without the boundaries that the—that a district—Charleston District would have ever assigned, students, across that bridge. I don't think it's feasible or realistic to do that. I am inclined to feel the same way about the Stono, Stiles Point using some schools in District 3, because here there are two bridges, both draw bridges that one has to go across and then go some, distance into the Stiles Point area. So it is a pretty good distance. And there are two bridges that are both draw bridges. I doubt if that would have been used, even if one could ignore the district boundaries, because of the rivers and

because of the relative distances involved here.

And the only one that—and I think that if you assign white students from Stiles Point into District 20, I think again you would have had substantial white flight. And while you might have gotten black students from Stiles Point, you would, not have gotten white students, I don't think, into Simons in the City, or you would have lost a lot of them and therefore you would be losing a resource that would provide for integration in District 3.

*Id.*, pp. 97–98. Therefore, Dr. Armor concluded that such changes, although theoretically possible in 1980, would not have had any appreciable effect insofar as further desegregation was concerned. *Id.*, pp. 99.

Dr. Clark, too, examined attendance zones to determine whether any significant increases in desegregation could have been accomplished if Constituent District boundaries were ignored. Clark, day 26, pp. 95–117. He identified the same possibilities that Dr. Armor mentioned and added that schools in Districts 2 and 20, across the long expanse of the Cooper River bridges from each other, could theoretically be zoned together to achieve more racial balance. However, he concluded that transporting children across the Cooper River would not be feasible because of the substantial barrier it presents and because such children would not show up if assigned to schools across the river. *Id.*, pp. 100–101, 105–109, 114–117. Because the Cooper River bridges are long and subject to serious safety problems, many parents would object to their children being transported over these bridges. Dr. Gordon, plaintiff-intervenors' expert, also testified that he would never recommend transporting students across the Cooper River bridges. Gordon, day 16, p. 27. The court agrees; especially does it agree that such transportation would constitute dangers to children's lives that this court would never order.

The court has also reviewed attendance zone maps and enrollment data and finds

persuasive Dr. Armor's and Dr. Clark's testimony that, even if Constituent District boundary lines had been ignored, school attendance zones could not have been drawn in such a way as to significantly improve desegregation. The court also notes that neither the United States nor plaintiff-intervenors presented any credible testimony disputing Dr. Armor's or Dr. Clark's conclusions or indicating where school attendance zones could realistically have been modified to improve desegregation if Constituent District lines had been ignored.

The evidence also indicates that in certain areas of the county, in particular District 20, a great majority of white students chose to attend private schools. For example, in Census tract number 20, the predominately white area at the tip of the peninsula, there were 69 students in grades 9–12. All of these children were enrolled in private schools. U.S. Ex. 911, p. 14.

While this court does find that the retention of the Constituent Districts for attendance purposes has had the effect of making integration slightly more difficult, this finding is undercut by the geography, demography, and private choices of Charleston County. As noted by the Fourth Circuit in *Goldsboro City Bd. of Educ. v. Wayne County Bd. of Educ.*, 745 F.2d 324, 333 (4th Cir.1984), "[The courts] are not at present charged with a responsibility to remedy problems caused by demography and private racism."

## C. LEGAL IMPLICATIONS

■ Having determined that Act 340, while having a slight discriminatory effect, was not passed with discriminatory intent, the court must examine the legal ramifications of such findings. The plaintiffs contend that Sections 7 and 8 of Act 340 are unconstitutional because they deny black children equal protection of the law as required by the Fourteenth Amendment of the United States Constitution. Consequently, they contend that these sections are void and should be disregarded by the court in determining if the CCSD is desegregated. In order to sustain their claim, this court feels that plaintiffs must prove that Act 340 was enacted with a discriminatory intent *and* that it has had a discriminatory effect. After reviewing the sequence of events leading to the passage of Act 340, and other evidence relating to the purpose of the Act and the changes made by it, the court concludes that the plaintiffs have not proven any requisite discriminatory intent; rather, the evidence shows that Act 340, including Sections 7 and 8 thereof, was passed for a perfectly legitimate purpose and is a valid exercise of state authority.

■ i. *Intent.* Racially discriminatory intent *and* impact are both required to establish the unconstitutionality of a governmental act under the Fourteenth Amendment. The United States Supreme Court held in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), that:

'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.' Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

*Id.* at 265, 97 S.Ct. at 563 (quoting *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). The Supreme Court has expressly held that the intent requirement set forth in the *Arlington Heights* and *Washington v. Davis* cases is applicable to school desegregation cases. *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). See, also, *Lee v. Lee County Bd. of Educ.*, 639 F.2d 1243, 1268 n. 18 (5th Cir.1981). In accordance therewith, in *Goldsboro City Bd. of Educ. v. Wayne County Bd. of Educ.*, 745 F.2d 324 (4th Cir.1984), the United States Court of Appeals for the Fourth Circuit held that "[w]ithout discriminatory intent there can be no violation of the Equal Protection Clause." *Id.* Moreover, the required discriminatory intent cannot simply be inferred from a finding of some slight discriminatory impact. In *Lee v. Lee County Bd. of Educ.*, 639 F.2d 1243 (5th Cir.1981), also a school desegregation

case, the United States Court of Appeals for the Fifth Circuit, citing the *Washington v. Davis* and *Arlington Heights* cases, held:

> The Supreme Court has now made clear that for purposes of equal protection analysis, a finding of discriminatory intent requires more than the sort of objective intent employed in civil and criminal law, which presumes that a person intends the natural and foreseeable consequences of his voluntary actions. A finding of discriminatory purpose or intent requires a finding that a public decision-maker embarked upon the challenged course of action 'at least in part "because of," not merely "in spite of" its adverse effects upon an identifiable group.'

639 F.2d at 1267–68 [citations omitted].

■ *Village of Arlington Heights,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), sets forth several criteria which the court should review in order to determine whether or not a discriminatory purpose was a motivating factor in the decision making process. These factors are as follows: (a) the historical background of the decision; (b) the specific sequence of events leading up to the challenged decision; (c) departures from the normal procedural sequence; and (d) the legislative or administrative history. *Id.* at 267–68, 97 S.Ct. at 564–65.

The evidence on the historical background reveals that consolidation of the school system was politically difficult; that all attempts to consolidate local government, other than the school system, had failed for various reasons; that the proponents of Act 340 were not racially motivated; and that, while some of the opponents may, in part, have been racially motivated, they had no impact on the final bill.

The specific sequence of events leading up to the passage of the Act also indicates that race was not a motivating factor on the part of the proponents, that there were legitimate and nondiscriminatory reasons for opposition to the bill, and that the final bill was not racially motivated. There were certainly legitimate and nondiscriminatory reasons for the legislators to pre-serve existing school boards and boundaries and for certain areas of the County, such as the North Charleston area, to oppose consolidation. The fact that race may have been a factor in the thinking of some of the opposition to the bill does not affect the reasoning of the proponents of the bill. If such were the case, an opponent of any measure, using race as an issue, could cause any governmental action to be invalidated, even though the proponents were never racially motivated. If plaintiffs' legal theory were correct, a single racially motivated opponent of any legislation could later cause greatly beneficial and nondiscriminatory legislation to be undermined in federal court.

The plaintiffs contend that the House amendments related only to school desegregation issues, that is, assignment of students and hiring of teachers. However, these are the same issues that go to the heart of local control of any school system, regardless of race. Such issues are not involved in countywide financial decisions, such as those relating to new tax bases and new school construction, which financial decisions were intended to be consolidated in a central fiscal authority—the CCSD—by the new Act.

The court concludes that the House amendments were not designed to accommodate resistance to faculty and student desegregation because (1) the ongoing process of desegregating faculty and students would not be affected by the bill or the House amendments, (2) all of the racially motivated opponents still opposed the bill, and (3) the opponents consistently said that the bill, even as amended, would lead to busing and desegregation. The purpose of the Act was to obtain the many benefits of fiscal consolidation; the House amendments made that lofty goal achievable by preserving local control. The court finds nothing amiss in the "give and take" involved in the legislative process in which two perfectly legimate goals were combined in order that much needed legislation could become law.

The court has also examined departures from normal practices. The plaintiffs con-

tend that the customary practice in the General Assembly was that local legislation, sponsored by the local delegation, was usually approved, almost as a matter of form, and that controversy surrounding local legislation was highly unusual. This is true, but had the school bill followed normal practice it would have been thoroughly defeated, as the Senate delegation overwhelmingly opposed the bill. Under such circumstances, there would now be eight separate school districts in Charleston County, with widely varying tax bases, and with widely varying physical facilities and teaching capabilities—in other words, without the Act the "rich would be richer" and "the poor would be poorer". The customary and normal practices were overcome in this instance by the *proponents* of Act 340, which is one of the reasons why there was so much controversy about the bill. Thus, departure from normal practice has led to an improved school system which ultimately has led to further desegregation, not less. This is completely different from the situation in which departure from normal procedures allows passage of racially inspired statutes. To the extent that there was a departure from normal procedures in this case, it was to overcome possible racial bias, not to facilitate the enactment of racially discriminatory legislation.

The court repeats its conclusion that Act 340 was passed in order to equalize funding between the eight school districts of Charleston County and to make the system more efficient by centralizing certain functions in a central authority. Furthermore, the inclusion of Section 7 of Act 340, which preserved the authority of the local Constituent Districts over assignment of students, and of Section 8, which preserved the authority of the local districts to enforce contracts with their teachers, does not constitute evidence of discriminatory intent. The courts have long acknowledged local control of public education in this country as a deeply rooted tradition. The tradition exists in South Carolina in which "[a] school district is a body politic and corporate under the laws of this State and constitutes one of our most important political subdivisions...." *Patrick v. Maybank*, 198 S.C.

262, 17 S.E.2d 530, 534 (1941); *see also* § 21–111 of the Code of Laws of South Carolina, 1952 and 1962 (§ 59–17–10 of the 1976 Code). This important tradition has been expressly recognized by the Supreme Court in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), in which the Court stated:

> No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. See *Wright v. Council of the City of Emporia*, 407 U.S., [451] at 469, 92 S.Ct., [2196] at 2206 [33 L.Ed.2d 51 (1973)]. Thus, in *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decision making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'

*Id.* at 741–42, 94 S.Ct. at 3125–26.

The plaintiffs also contend that Section 7 of Act 340 was enacted in response to constituent concerns that without Section 7 the Act could lead to reassignment or "busing" of students away from neighborhood schools and that this is evidence of discriminatory intent. While there is *no* evidence that the legislators who supported Act 340 were motivated by such concerns, whether they were or not does not indicate discriminatory intent. In the *Goldsboro* case, the Fourth Circuit Court of Appeals specifically affirmed the district court's finding that opposition to changes by parents because they *might result in their children being* reassigned to schools outside their communities was logical, legitimate *and non-discriminatory.* 745 F.2d at 326. Moreover, neither the lower court nor Supreme Court decisions in the *Swann* case, which decisions introduced "busing" as a permissible

school desegregation remedy, existed until after the passage of Act 340.

Unlike Congress, the General Assembly of South Carolina does not provide a legislative history for Acts that it passes. Newspaper articles, testimony of the legislative delegation at the time Act 340 was passed, and other historical data were considered by the court, and the court has used these data in formulating the factual conclusions hereinabove set forth.

Having found no discriminatory intent, the court concludes, based on the authorities hertofore cited, that Act 340 is not unconstitutional even though the Act may have a slight discriminatory impact on school desegregation. The law seems clear to this court that proof of discriminatory *intent*, by direct or circumstantial evidence, is an absolute requirement in Fourteenth Amendment equal protection cases.

ii. *Effect.* In addition to discriminatory intent, evidence of significant discriminatory impact is also required to prove that a state statute violates the Equal Protection Clause. *Goldsboro City Bd. of Educ. v. Wayne County Bd. of Educ.*, 745 F.2d 324 (4th Cir.1984).

As heretofore noted, the court concludes that Act 340 did have some discriminatory impact insomuch as the Act did not attempt to re-examine the lines for student and teacher assignments. However, the court finds that the mere presence of a slight impact on racial assignment, when examined in light of the unique geography of Charleston County, does not rise to the level of a constitutional violation. Although Act 340's retention of already existing districts did slightly affect the possible racial composition of the schools, the Act did not impede the affirmative duty to desegregate or interfere with desegregation in Charleston County merely because it did not change the system of assigning students or hiring teachers in Charleston County. The lines between the Constituent Districts are not vestiges of the formerly dual school system, and Act 340 did not impose any greater restrictions on the transfer of students and faculty members across district lines than had previously existed.

The plaintiffs contend that Act 340, regardless of whether it was passed with a discriminatory intent, should be disregarded by the court in evaluating the CCSD's desegregation efforts because it has had the effect of impeding or hindering desegregation of the schools of Charleston County. They rely on *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), in which the Supreme Court held that part of the affirmative duty to desegregate is the obligation not to take any action that would impede the process of disestablishing the dual system and its effects. *See also Dayton Bd. of Educ. v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) *(Dayton II ).*

Before the passage of Act 340, the trustees of the school districts in Charleston County had the authority to "[t]ransfer any pupil from one school to another so as to promote the best interests of education, and determine the school within its district in which any pupil shall enroll." § 21–230(9) of the Code of Laws of South Carolina, 1962. After the enactment of Act 340, the trustees of the Constituent Districts in Charleston County had the same authority, *i.e.,* "[t]o transfer any pupil from one school to another within the same constituent district so as to promote the best interest of education, and determine the school within such constituent district in which any pupil shall enroll." Act 340, § 7(1).

Before passage of Act 340, students could be transferred from the district in which they resided to an adjoining school district with the consent of the trustees of the both school districts, and the County Board of Education could order a transfer when the trustees of the receiving school district "unreasonably or capriciously [withheld] their consent." §§ 21–849 and 21–851 of the Code of Laws of South Carolina, 1962. After the passage of Act 340, the trustees of the Constituent Districts had the identical authority to transfer students. §§ 59–63–490 and 59–63–510 of the

Code of Laws of South Carolina, 1976. CCSD Ex. 49A, pp. 26–33 (*Ops. Att'y. Gen.,* September 1, 1977).

Before the passage of Act 340, the trustees of the separate school districts had the authority to "[e]mploy teachers ... subject to the supervision of the county board of education." § 21–230(2) of the Code of Laws of South Carolina, 1962. After Act 340, the teachers in the Constituent Districts were employed by the trustees of the Constituent Districts, subject to the approval of the Board of Trustees of the Charleston County School District. Act 340, § 6; *Ops. Att'y. Gen.,* August 8, 1968. Although plaintiffs complain of the restrictiveness of Section 8 of Act 340 requiring the consent of the teacher and both Constituent Districts involved before transfer of the teacher between those Constituent Districts can occur, this is no more restrictive than prior law. Earlier law contained no specific provisions permitting transfers of teachers between districts, but it is apparent that such a transfer would have required, at a minimum, the consent of the teacher and the school districts involved, therefore, Act 340, by expressly acknowledging and providing for teacher transfers, was, if anything, less restrictive than prior law.

The court concludes that Act 340 did not hinder or impede the satisfaction of the affirmative duty to desegregate schools, because the Constituent Districts had no less authority to desegregate the schools within their districts and no less power to transfer students from one Constituent District to another Constituent District under Act 340 than they had before its enactment. It is only to the extent that the General Assembly did not redraw the attendance zones that the court finds that Act 340 had a slight discriminatory effect, but nothing in this holding should be read to suggest that defendants had a duty to redraw these zones and failed to carry out that duty under *Brown* and its progeny.

*Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), provides no support for plaintiff's contention; rather, it supports this court's conclusion that Act 340 did not inhibit the affirmative duty to desegregate the schools in Charleston County. In that case, a county school district had been ordered to desegregate, but two weeks later the local electorate tried to carve a new, predominately white "city district" out of the county, thereby leaving the remaining part of the county predominately black. The Supreme Court had little trouble dealing with this obvious affront to the Federal Court's power to carry out desegregation of the schools. After discussing the suspicious circumstances of the actions taken, the court held as follows:

> [S]ince the city and the county constituted but one unit for the purpose of school assignments *during the entire time that the dual system was maintained,* they were properly treated as a single unit for the purpose of dismantling that system.

407 U.S. at 459–60, 92 S.Ct. at 2202 (emphasis added). In the instant case, Charleston County was divided into eight school districts during the time that the dual system was maintained, and there is nothing unconstitutional about treating it as eight school districts for the purpose of dismantling that system. No attempt has been made to divide it into smaller districts which would be more segregated than if the prior system had been preserved. Here, Charleston County properly maintained the same districts for the purposes of school attendance and faculty assignments, unlike Emporia, Virginia, which attempted to subdivide its district into two districts that would permit more segregation than the system in place when it came under an order to desegregate its schools.

*Dayton II* is also distinguishable from this case. In that case, the Court found that the Dayton school board had engaged in many post-*Brown* actions which had the effect of increasing segregation. 443 U.S. 538, 99 S.Ct. at 2979. Consequently, Dayton's schools remained virtually all black or all white. At the time of the hearing, "of 68 schools, 47 were virtually of one race (22 black, 25 white)...." 443 U.S. at 529–30, note 1, 99 S.Ct. at 2975, note 1. Thus, the Dayton board had not only preserved the one-race character of its schools in a dis-

trict of mixed population (44.6% black), but it had also taken additional measures to increase such segregation or to impede or hinder desegregation. Unlike the acts of the school board in Dayton, Act 340 did not increase segregation in Charleston County. As a consequence, Charleston County does not have separate schools for blacks and whites, as did Dayton. While some of its schools are predominately black, that is the result of demographic factors and private white schools, and not because the white students have been concentrated in "white schools," as was the situation in Dayton. Where mixed population pattens make integrated schools feasible in Charleston County, it has been achieved.

The plaintiffs' principal criticism of Act 340 appears to be not with what it changed, but with what it did not change—the local districts' authority over teacher and student assignments. However, the General Assembly, when it undertook to eradicate unequal tax bases in Charleston County, and make possible better physical facilities and teaching capabilities in poorer and predominately black school districts, did not have a *duty* to consolidate authority over student assignments and faculty hiring in the CCSD, as such functions could legally remain in the hands of the local or Constituent Districts where such functions had previously been vested. No law, in this court's opinion, under the · circumstances here involved, holds that a school district or state legislature has any duty, when amending a rule or law, to change it in such a manner to (1) insure a result of greater racial balance across a larger area and to (2) repeal existing legislation which interferes with achieving that racial balance, unless it was already under a duty to pass such legislation. In this case, neither the State nor the CCSD were under *any* duty in 1967 to consolidate or merge the eight school districts in Charleston County. The fact that action that primarily benefitted · the plaintiffs was taken regarding some aspects of the school system does not now, nor did it then, create a constitutional duty to act on some other aspect of the system which was left unchanged. *Board of Educ. of Indep. School Dist. No. 53 v.*

*Board of Educ. of Indep. School Dist. No. 52,* 413 F.Supp. 342, 349 (W.D.Okla.1975), *aff'd,* 532 F.2d 730 (10th Cir.1976), *cert. denied,* 429 U.S. 894, 97 S.Ct. 253, 50 L.Ed.2d 176 (1976), ("[U]nder the law this Defendant had no 'affirmative duty' or any duty to permit or agree to the annexation of the remaining portion of the [plaintiff] district following the transfer" of part of the plaintiff district to the defendant district). "A statute is not invalid under the Constitution because it might have gone farther than it did...." *Goesaert v. Cleary,* 335 U.S. 464, 467, 69 S.Ct. 198, 200, 93 L.Ed. 163 (1948) (quoting *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929)). *Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) (citing *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911)) holds that "the Equal Protection Clause does not require that a State must .choose between attacking every aspect of a problem or not attacking the problem at all." The plaintiffs would force just such a choice upon the defendants. Under plaintiffs' theory, defendants could not have equalized the distribution of school revenues without, at the same time, changing the districts in which children attended school. Under such a premise, the defendants would have been prevented from undertaking constructive measures for the schools in Charleston County without also creating a duty, which had not previously existed, to move students and teachers across boundary lines that were not constitutionally defective.

This conclusion that the defendants did not have the duty to desegregate across Constituent District lines when Act 340 was passed is further supported by *Dayton I,* in which the Supreme Court concluded that the school board's rescission there of previously adopted board resolutions, which acknowledged responsibility for segregation and called ˙for various ˙ remedial measures, was not a constitutional violation in and of itself; rather, the propriety of the rescission depended upon whether the board was constitutionally required to make the resolution in the first instance:

"The question of whether a rescission of previous Board action is in and of itself a violation of appellants' constitutional rights is inextricably bound up with the question of whether the Board was under a constitutional duty to take the action which it initially took.... If the Board was not under such a duty, then the rescission of the initial action in and of itself cannot be a constitutional violation."

*Dayton Board of Education v. Brinkman*, 433 U.S. 406, 414, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (quoting *Brinkman v. Gilligan*, 503 F.2d 684, 697 (6th Cir.1974)) (citations omitted).

Similarly, in *Crawford v. Board of Educ. of the City of Los Angeles*, 458 U.S. 527, 535, 102 S.Ct. 3211, 3216, 73 L.Ed.2d 948 (1982), the plaintiffs challenged an amendment to the State Constitution of California which limited state court-ordered busing for desegregation purposes to those instances in which a federal court would order busing to remedy a Fourteenth Amendment violation. The Supreme Court held as follows:

> But Proposition I [the amendment] does not embody a racial classification. It neither says nor implies that persons are to be treated differently on account of their race. It simply forbids state courts to order pupil school assignment or transportation *in the absence of a Fourteenth Amendment violation.* The benefit it seeks to confer—neighborhood schooling—is made available regardless of race in the discretion of school boards.

*Id.* at 537, 102 S.Ct. at 3217 (emphasis added). In other words, under *Crawford*, the State of South Carolina and the CCSD cannot be penalized for failing to do more than the Fourteenth Amendment requires. Consequently, the defendants were under no obligation to redraw the boundary lines of Constituent Districts to consolidate them further at the time of the passage of Act 340. *See also Parent Assoc. of Andrew Jackson High School v. Ambach*, 598 F.2d 705 (2d Cir.1979).

In this case, while there was a duty to eliminate the dual school system in each district, there was never a duty on the part of the State of South Carolina, Charleston County, or any other public official to eliminate racial imbalances between the districts. Yet, that is exactly the duty that plaintiffs would place on the General Assembly when Act 340 was passed. The fact that no duty existed to change all aspects of the Charleston County School System merely because funding and some other functions were consolidated in 1967 under Act 340 is also supported by South Carolina and United States Supreme Court cases concerning the equalization of school funding. The Education Finance Act of 1977, § 59–20–10 *et seq.* of the Code of Laws of South Carolina, 1976, as amended, provides for the equalization of school funding in this State through a shared funding formula under which school districts with lower tax bases receive more state funding and provide less local funding, and districts with wealthier tax bases receive less state funding and provide more local funding. *See* § 59–20–40(1)(e) and (f); *Richland County v. Campbell*, 294 S.C. 346, 364 S.E.2d 470 (1988). In *Richland County v. Campbell*, the court stated: "We conclude that the shared funding plan implemented by the General Assembly through the EIA and EFA is a rational and constitutional means by which to equalize the educational standards of the public school system and the educational opportunities of all students." 364 S.E.2d at 472. Therefore, the Education Finance Act did not eliminate school districts as entities with valuable educational responsibilities, although it provided for equalization of school funding. Similarly, although Act 340 does not provide for taxation at the Constituent District level, it does retain other Constituent District functions while equalizing funding across the county.

This approach of maintaining local control while equalizing funding was upheld by the United States Supreme Court in *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), in which the Texas educational finance system was at issue. Although the case did not address school desegregation,

the following finding of the Court is relevant here:

> The Texas system of school finance is responsive to these two forces. While assuring a basic education for every child in the State, it permits and encourages a *large measure of participation in and control of each school district's schools at the local level.* In an era that has witnessed a consistent trend toward centralization of the functions of government, local sharing of responsibility for public education has survived.

*Id.* at 49, 93 S.Ct. at 1305 (emphasis added).

Here, Act 340 is consistent with these desirable goals of equitable financing and local control that were recognized by the United States Supreme Court in *Rodriguez.* It provides for equality of school funding on a countywide basis while maintaining local control at the Constituent District level, just as the State's Education Finance Act and the Texas school funding statute provided for some equalization of school funding while maintaining local control in the school districts. Therefore, the passage of Act 340 for funding and certain administrative purposes did not require that the Constituent District lines be eliminated and that other educational and governmental matters be addressed therein. Absolutely no requirement existed that Constituent District control of faculty and student assignments be eliminated when Act 340 was passed. Act 340 serves both forces in education recognized by the United States Supreme Court in *Rodriguez,* to wit:

> While assuring a basic education for every child in the [county], it permits and encourages a large measure of participation and control of each district's schools at the local level.

*Id.*

That racial balance between Constituent Districts is not constitutionally required is also supported by the Fifth Circuit Court of Appeals decision in *United States v. Gregory-Portland Indep. School Dist.,* 654 F.2d 989 (5th Cir.1981). In that case, two towns, one primarily populated by Anglos and the other, by Mexican–Americans, consolidated their respective school districts into a single district. Nevertheless, the elementary school attendance zones were left unchanged, with each ethnic group attending largely homogeneous schools in the two towns. The United States saw intentional segregation in the presence of racially homogeneous schools within a single district and brought an action seeking desegregation. The court held that, when the two districts voted to consolidate, they had no duty to racially balance the schools in those districts which had different ethnic balances:

> [The districts] simply happened to have different ethnic mixes in their populations. There is nothing intrinsically sinister in that circumstance, and nothing in the record suggests that it was the product of any government action, well or badly intended, whatever. This being so, the [district] Board lay under no constitutional duty to "integrate" either school, and its decision to continue each as a community school for younger students was not a violation of the Constitution. . . . In short, all the Board did was leave the attendance zone line between Gregory and Portland where it was in the face of a widening ethnic percentage difference between them.

*Id.* at 1005–06 (citing *Swann,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281). The court reiterated that since the ethnic imbalance arose without segregative intent or government involvement, there was "no doubt whatever" that the Board had no duty to alter it. *Id.* at 1006.

Although the United States contends that *Gregory–Portland* is inapplicable here, this court feels that it is squarely on point. Just as *de jure* segregation had not been practiced against the Mexican–Americans in *Gregory–Portland* and just as the segregation in their groups had not been caused by governmental action, the division of the Charleston School District into eight school districts has been found not to be the vestige of *de jure* segregation. Instead, the differences in the racial balances of the eight Constituent Districts is the "natural consequence" of a corresponding population in each part of the district. 654

F.2d at 1005. "This condition ... was not caused and has not been contributed to by any governmental action whatever, state or local, but is rather the product of indifferent historic and demographic forces." *Id.* Accordingly, the defendants were under no duty to alter the differences in the racial balances between the eight Constituent Districts in Charleston when Act 340 was passed for the same reason found by the Fifth Circuit in *Gregory–Portland:*

> Since no action of the Board or other governmental authority caused or contributed either to the existence or the intensification of ethnic disproportion in GPISD, the Board had no duty to alter it.

*Id.* at 1007.

If Act 340 had never been passed, there never would have existed, under the present status of the law, a basis for this action; yet the students and faculty would still be assigned to the same districts as they are now assigned. The mere fact that some beneficial reforms were undertaken in Act 340 does not justify the proposition that cross-district desegregation had to be undertaken as well. Since this court has found that the boundary lines of the eight Constituent Districts are not vestiges of a former *de jure* school system, no constitutional violation exists as to those lines and no duty existed to eliminate or alter them.

## VI. HAVE DEFENDANTS SATISFIED THEIR DUTY TO DESEGREGATE?

Having determined that Act 340 is constitutional, thereby making the constituent districts the proper basis of comparison, the court must now examine whether defendants have met their duty to desegregate and whether they now operate a unitary school system in Charleston County. In a school system which is allegedly not yet unitary, plaintiffs bear the burden in the first instance of proving that there are "current disparities" in the school system. *Keyes v. School Dist. No. 1, Denver, Colo.,* 413 U.S. 189, 200, 93 S.Ct. 2686, 2693, 37 L.Ed.2d 548 (1973). Once that showing is made, plaintiffs are entitled to a presumption that such "current disparities" are causally related to the formerly dual school system, and the burden of proof shifts to the defendants to show that is not the case.

Plaintiffs must therefore first show "current disparities" in the school system. Plaintiffs concede that they have the burden of proof on this issue, and the court concludes likewise. See Plaintiff–Intervenors' Brief in Opposition to Defendants' Motion to Dismiss, p. 9.

In seeking to satisfy their burden of proof that current disparities exist in the CCSD, each plaintiff uses a different method. Dr. Bennett, the United States' only expert witness, testified that, in his opinion, the school system was not fully desegregated because there are still a number of schools in the CCSD with student enrollments over 90% black. Dr. Gordon, plaintiff-intervenor's expert, used a different approach. He testified that, in his opinion, there are a number of schools in the CCSD which have disproportionately black or white enrollments when compared with the countywide black and white enrollment, and for that reason, present segregation exists in the CCSD. In addition, each testified that schools were identifiable with respect to teachers and principals because of a strong correlation between the race of the student enrollment at a given school and the predominate race of the faculty. In reaching their conclusion that present segregation exists in the CCSD, both assumed that student and faculty assignments were or could have been made on a countywide basis regardless of the provisions of Act 340, which largely vest that authority in the Constituent District Boards.

## A. THE SIGNIFICANCE OF PRE-DOMINATELY BLACK SCHOOLS

■ In deciding whether plaintiffs have carried their burden of proof to show current disparities, the court first addresses the following issue: Does proof of the existence of a number of predominately black schools in a predominately black district, without more, establish the "current disparities" or type of *prima facie* case necessary to shift to defendants the burden to

prove that such schools are not causally related to the former dual school system?

The court concludes that such proof is not sufficient. In *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), Justice Marshall, in his dissenting opinion, argued that the Detroit schools could not be considered desegregated because they had a majority of black students, even though the Detroit school system itself was predominately black. The majority of the Supreme Court rejected Justice Marshall's proposition in no uncertain terms, stating:

> The suggestion in the dissent of Mr. Justice Marshall that schools which have a majority of Negro students are not "desegregated," whatever the racial makeup of the school district's population and however neutrally the district lines have been drawn and administered, finds no support in our prior cases. In *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), for example, this Court approved a desegregation plan which would have resulted in each of the schools within the district having a racial composition of 57% Negro and 43% White. In *Wright v. Council of the City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), the optimal desegregation plan would have resulted in the schools being 66% Negro and 34% white, substantially the same percentages as could be obtained under one of the plans involved in this case. And in *United States v. Scotland Neck City Board of Education*, 407 U.S. 484, 491 n. 5, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972), a desegregation plan was implicitly approved for a school district which had a racial composition of 77% Negro and 22% white. In none of these cases was it even intimated that "actual desegregation" could not be accomplished as long as the number of Negro students was greater than the number of white students.

418 U.S. at 717, 94 S.Ct. at 3128, n. 22. Other cases have also made it clear that the mere fact that a school system may be predominately black and therefore have some, or even a large percentage of, predominately black schools does not equate to illegal segregation. In 1987, the United States Court of Appeals for the Fourth Circuit declared the Richmond, Virginia, School District unitary even though its student enrollment was 86.4% black and many of its schools had a black enrollment which exceeded 90%. *Richmond v. Baliles*, 829 F.2d 1308 (4th Cir.1987). In 1975, the Fifth Circuit Court of Appeals declared the Atlanta, Georgia, school system unitary even though 92 of its 148 schools were over 90% black. *Calhoun v. Cook*, 522 F.2d 717 (5th Cir.1975). In Goldsboro, North Carolina, the unitary nature of the Goldsboro City School System was recently approved by the Fourth Circuit Court of Appeals even though its schools were 77% black. *Goldsboro City Board of Education v. Wayne County Board of Education*, 745 F.2d 324 (4th Cir.1984). Thus, the issue is not simply whether there are schools in the CCSD which are predominately black. In a predominately black district, this will always be the case because, even if assignments within the district have been made to achieve perfect racial balance, all or most of the individual schools will still be predominately black.

In determining what constitutes the "current disparities" which plaintiffs must establish, the court concludes that the proper inquiry is whether certain schools are disproportionately or predominately black, while other schools in the same Constituent District [5] are disproportionately or predominately white. In such situations, the schools then become racially identifiable because some are "black" schools and some are "white" schools. As a result, "current disparities" exist, and the burden shifts to the school district to explain them. Therefore, when the Court in *Swann* discussed the significance of the existence of one-race schools on a school district's affirmative obligation, it was in the context of one-race

---

**5.** As set forth herein, the court has concluded that student and faculty assignments should be evaluated on a Constituent District basis and not on a countywide basis.

schools in a district of mixed population, where more racially balanced assignments may be feasible. *Swann v. Board of Educ.*, 402 U.S. at 25–26, 91 S.Ct. at 1281 ("Schools all or predominantly of one race *in a district of mixed population* will require close scrutiny to determine that school assignments are not part of state-enforced segregation"). In *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 198–200, 93 S.Ct. 2686, 2692–93, 37 L.Ed.2d 548 (1973), the segregation found objectionable by the Court was the practice of concentrating blacks and other minorities in some schools, while keeping other schools for whites. 413 U.S. at 198–201, 93 S.Ct. at 2692–94. In *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 537, 99 S.Ct. at 2979 (1979), the evidence showed that at the time of trial, 47 of 68 schools in *Dayton* remained as one-race schools, with 22 schools over 90% black and 25 schools over 90% white. 443 U.S. at 529, n. 1, 99 S.Ct. at 2975, n. 1. Thus, these cases all involved situations where there clearly were "current disparities." Black children were being assigned to predominately black schools and white children were being assigned to separate predominately white schools. That is not the situation in Charleston County, where, with one justifiable exception [6], the schools are either integrated or predominately black. No schools are being reserved or designated for blacks or whites. That schools are predominately black in some Constituent Districts only results from the fact that the student enrollment of the Constituent District is predominately black. The evidence herein reveals that student assignments in those particular districts have been made in the most desegregative manner possible. Consequently, the issue in this case is not whether Districts 1, 20 or 23 have predominately black schools—(they clearly do)—but whether such schools evidence "current disparities" within those Constituent Districts, that is, the designation of some schools as black and others as white.

Plaintiffs have the burden to prove such disparities, and, if they do, defendants have the burden of proving that such disparities are not causally related to the prior dual school system. However, proof that schools in a predominately black school Constituent District are predominately black is not sufficient to trigger a shift in the burden of proof.

### B. CONSTITUENT DISTRICT VERSUS CCSD—THE STANDARD OF COMPARISON

Plaintiffs contend that they have established "current disparities" because there are a number of disproportionately black and white schools within the CCSD when the schools are evaluated with reference to the total percentage of black and white enrollment in the CCSD. The same disparities exist, they contend, when faculty assignments at each school are evaluated on a CCSD wide basis. However, the court has determined that student assignments and faculty assignments at each school should not be compared to the racial makeup of the student enrollment and faculty in the entire County—(as plaintiff-intervenors and the United States contend)—but should be compared with the racial makeup of the student enrollment and faculty in each Constituent District in which the school is located—(as defendants contend). In more specific terms, the ± 20% standard enunciated in *Adams v. Weinberger*, 391 F.Supp. 269 (D.D.C.1975), or the ± 15% guideline used by plaintiff-intervenors' expert witness, Dr. Gordon, should not be applied against the percentage of black students in the entire County in determining whether individual schools are substantially racially balanced but should be applied against the percentage of black students in the Constituent District from which student assignments to that particular school are made.[7]

The same issue exists with respect to whether teacher assignments have been

---

6. Sullivan's Island Elementary School, due to its isolated, island location, is predominately white.

7. This ruling, of course, dovetails with the ruling made earlier in this order that Act 340, with its Constituent District system, does pass constitutional muster.

made in accordance with the so-called *Singleton* rule set forth in *Singleton v. Jackson Mun. Separate School Dist.*, 419 F.2d 1211 (5th Cir.1969), which required that teachers and other staff be assigned so that the ratio of black and white teachers in each school is substantially the same as the teachers and staff in the school district. *Id.* at 1218. In applying the *Singleton* rule to this case, the court has decided that the ratio of black and white faculty at each school should be compared with the ratio of black and white faculty in the Constituent District in which the school is located, not with the faculty ratio in the entire County.

At the time of the *Brown II* mandate, as well as the *Green* decision, Charleston County had eight separate school districts, and each was under an affirmative duty to desegregate the schools within their respective jurisdictions. Effective July 1, 1968, Act 340 vested certain duties and responsibilities in the newly created CCSD, but left responsibility for student assignments and faculty hiring in the eight separate Constituent Districts in which such responsibility had previously been vested. Plaintiffs contend that the Constituent Districts were newly created by the General Assembly, but the language of the Act, as well as the testimony of the legislators regarding the intent of the Act, indicates that they were, in reality, nothing more than the continuation of the eight separate districts minus certain fiscal powers. The exact same members of the boards of trustees remained in office. Act 340, Section 1. Future members of the Constituent District boards were to be elected in exactly the same manner as they were before Act 340. The Constituent Districts had exactly the same territories and authority over, among other things, student assignments and faculty hiring as the former eight school districts. Some of their other powers, primarily fiscal in nature, were removed and placed in the newly created CCSD.

If the CCSD had not been created, all parties agree that the schools of each of the eight districts would be evaluated with respect to other schools in its district and not with respect to schools in other districts where different authorities are responsible for student assignments. To the extent the County Board of Education and eight separate school districts in Charleston County had an affirmative duty to desegregate prior to Act 340, the CCSD and Constituent Districts continued to have that same duty after Act 340 became the law on July 1, 1968. The mere enactment of Act 340 did not require a wholesale shifting of students and teachers to meet a newly defined countywide standard for racial balance and was never understood to do so by any of the authorities involved. For example, District 23 has been predominately black since at least 1930. Prior to the passage of Act 340, its population and school enrollment were over 90% black, and they have continued to be over 90% black. The passage of Act 340 did not require that District 23's individual schools be evaluated against the countywide enrollment of 55% black, unless it were shown that Act 340 had increased the proportion of black enrollment in District 23 or had otherwise caused the District 23 schools to become more segregated than they would have been absent Act 340. As noted earlier in this order, the court does find that perhaps the attendance zones in Charleston County could be drawn differently to allow for a somewhat better racial mix if Constituent Districts did not exist. However, this finding does not invalidate sections 7 and 8 of Act 340, and, therefore, this court reviews only the racial composition of the Constituent District when determining whether the dual system has been abolished.

■ The court further notes that, following Act 340, the Office of Civil Rights ("OCR") continued to recognize that the duty to eliminate the vestiges of student and faculty segregation lay with the Constituent Districts, and that Act 340 had not changed the method of student or faculty assignment for desegregation purposes. In accordance with the legal opinion of HEW's general counsel, OCR approved the final Constituent District desegregation plans in 1970, and has approved all subsequent changes on a Constituent District basis beginning in 1971, until this litigation

was commenced in 1981. In 1975, when *Adams v. Weinberger*, 391 F.Supp. 269 (D.D.C.1975), was decided, the schools were reviewed by OCR to insure compliance with the ±20% guideline handed down by that court, and the plans were again approved on a Constituent District basis. In 1979, OCR specifically confirmed to the CCSD that assignment of both students and teachers on a Constituent District basis was appropriate to satisfy constitutional requirements. While decisions by OCR are not binding on this court, consistent decisions over a period of many years by that government agency charged with insuring that school desegregation is carried out is entitled to considerable weight by this court. *E.g., Bowman v. County School Bd. of Charles City County, Va.*, 382 F.2d 326, 328 (4th Cir.1967); *Smith v. Board of Educ. of Morrilton School Dist. No. 32*, 365 F.2d 770, 780 (8th Cir.1966); *Kemp v. Beasley*, 352 F.2d 14, 19 (8th Cir.1965); *Singleton v. Jackson Mun. Separate School Dist.*, 348 F.2d 729 (5th Cir.1965); *Whittenberg v. Greenville County School Dist.*, 298 F.Supp. 784, 789 (D.S.C.1969); *Wright v. County School Bd. of Greenville County, Va.*, 252 F.Supp. 378, 383 (E.D.Va.1966).

The OCR decision making process in this case is especially important, because OCR evaluated the Charleston County schools on a Constituent District basis not only because of state law requirements (*i.e.*, Act 340), but also because of geographic considerations. Given the size of Charleston County, as well as its unique geography, OCR concluded, as does this court, that it is more appropriate to evaluate schools based on Constituent District boundaries.

Since the court has found that Act 340 was not passed with a racially discriminatory purpose and has not really impeded or hindered school desegregation in Charleston County, the court concludes that there is no basis for disregarding the Constituent Districts, or their statutory place in the public education system of Charleston County in evaluating whether the dual school system has been dismantled and replaced by a unitary system. Both before and after *Brown I* and *Brown II*, the trust-

ees of the eight local districts, which after 1968 became Constituent Districts, had the authority to employ teachers, subject to the supervision of the County Board of Education, and to assign students to schools within their respective districts. See §§ 21–111, 21–221, 21–230, 21–849, 21–850 of the 1952 and 1962 Code of Laws of South Carolina; see similar provisions in §§ 59–17–10, 59–19–10, 59–19–90, 59–63–490, and 59–63–500 of the 1976 Code; as to Charleston County, see Chapter 25, § 21–1601 *et seq.* of the 1952 Code and Chapter 27, § 21–1601 of the 1962 Code.

Plaintiffs contend that the Constituent Districts themselves and their boundaries are vestiges of the dual school system, and, therefore, should not be considered when evaluating faculty or student assignments. However, the court finds no credible evidence to support that contention. No law has ever required segregation between these school districts, as opposed to the schools within them. *Bradley v. School Bd. of City of Richmond, Va.*, 462 F.2d 1058, 1065 (4th Cir.1972). As set forth previously, the court is convinced by the evidence that the boundaries of the eight Constituent Districts, and the eight separate school districts which preceded them, were not established for the purpose of segregating black and white students into separate school districts. When, as in this case, discrimination is not involved in the organization of these Constituent Districts, their concept is analogous to a neighborhood school system which does not violate the Constitution, as made clear by the Fourth Circuit's holding in *Riddick v. School Bd. of City of Norfolk*, 784 F.2d 521 (4th Cir.1986):

> The concept of a neighborhood school system in and of itself is not violative of the Constitution, E.g. *Crawford v. Los Angeles Board of Education*, 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217–18 n. 15, 73 L.Ed.2d 948; *Swann, supra*, 402 U.S. at 28, 91 S.Ct. at 1282; *Thompson v. Sch. Bd. of City of New Port News*, 465 F.2d 83 (4th Cir.1972). Congress has recognized that absent discrimination the neighborhood school is the appropriate

basis for school assignments. 20 U.S.C. § 1701. Without more, we find nothing constitutionally suspect in the board's preference for a neighborhood school plan.

*Id.* at 540.

The Constituent District boundary lines were drawn along natural features or followed pre-existing political subdivisions, and were not drawn to separate the races. Therefore, such boundary lines are racially neutral and are not themselves vestiges of the former dual school system.

Since the eight school districts of Charleston County that existed at the time of *Brown I* and *Brown II* were the primary units for pupil and teacher assignments and were also separate political subdivisions in the State of South Carolina, the affirmative duty to desegregate the formerly dual school systems in Charleston County existed within each of these eight school districts and did not extend across their boundary lines.[8] The mere passage of Act 340, which preserved the authority of the local school districts to assign students and hire teachers, did not result in a change in the standard by which student assignments and faculty assignments would be judged in determining if the pub-

lic school officials' duty to desegregate the Charleston County public schools has been satisfied.[9]

## C. SATISFACTION OF DUTY TO DESEGREGATE

■ Having established the proper standard by which to determine whether illegal segregation is present in the school system, the court must decide whether plaintiffs have carried their burden to prove that "current disparities" exist in the Charleston County school system, and, if so, whether defendants have carried their burden to rebut the presumption that such disparities are the result of the former dual school system. As set out above, the court has concluded that a countywide analysis of faculty and student assignments is not the proper standard, because it disregards both the practical and legal framework within which the CCSD does *and* must operate. Further, as set forth below, the court concludes that plaintiffs have not carried their burden to prove that current segregation exists in the CCSD.[10] The court finds that the CCSD and each of the Constituent Districts are desegregated. To the extent that disparities still exist within

**8.** The plaintiffs concede in their response to Question 2 of the State of South Carolina's Interrogatories that they do not contend that the State of South Carolina had an affirmative duty to desegregate the schools in Charleston County on a countywide basis prior to the passage of Act 340. S.C. Ex. 8, S.C. Ex. 9.

**9.** Although the plaintiff-intervenors introduced some evidence indicating that, under the days of the *de jure* segregated school system in Charleston County, some students of both races were transferred out of the districts in which they resided to adjacent school districts because of the lack of availability of schools of their race in the district in which they resided, no evidence exists that this practice was widespread. Moreover, the evidence shows that such transfers were properly approved under existing state law virtually identical to current state law governing transfers between districts. Furthermore, "unless it is established that these transfer programs have a substantial, direct and *current* segregative effect.... no interdistrict remedy is appropriately ordered upon the basis of earlier interdistrict transfer programs." *Goldsboro City Board of Education v. Wayne County Board of Education,* 745 F.2d 324, 330–31 (4th Cir.1984)

(quoting, with approval, *Lee v. Lee County Board of Education,* 639 F.2d 1243 (5th Cir. 1981)). In neither *Lee* nor *Goldsboro,* did the courts of appeal find any current segregative effects of the prior transfers. Here also, no evidence was presented indicating that those prior transfers had any current segregative effect, and the court concludes that such transfers did not have such an effect.

**10.** Even if the court has incorrectly allocated the burden of proof on this issue, it would not change the court's decision. If defendants have any burden of proof on this issue, they have rebutted any presumption that the predominately black schools in the school system are causally related to the former dual school system. As set forth previously, the court is persuaded by the evidence that such schools result from the predominately black population patterns in their Constituent Districts or the choice of white parents in those Constituent Districts to enroll their children in private schools, and not from the former dual school system. Thus, to the extent the burden has shifted to the CCSD on this issue, the court finds that it has met its burden to show that such schools are not causally related to the former dual school system.

the Constituent Districts, they are not substantial, given the overall size of the CCSD and the degree of desegregation attained in each of the Constituent Districts.[11] Moreover, the court finds that defendants have carried their burden of proving that such limited disparities are not causally related to the former dual school system.

In determining whether a school district has been desegregated in accordance with constitutional requirements, courts have traditionally scrutinized a school system's performance in six areas: pupil assignments, faculty hiring and assignment, facilities, resource allocation, transportation and extracurricular activities. *Green v. County School Bd. of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The court has carefully examined the CCSD's and Constituent Districts' performance in these areas and has found no evidence of discrimination.[12]

### 1. *Student Assignments*

After reviewing the evidence and considering the applicable legal principles and practical circumstances, the court concludes that the CCSD has satisfied its burden to prove that it is operating a unitary school system with respect to student assignments. The schools are in substantial racial balance when evaluated with respect to the ratio of black and white students in their respective Constituent Districts.

The court concludes that school attendance zones, which determine student assignments, have been established in a nondiscriminatory manner designed to fully desegregate each Constituent District. When the actions of each Constituent District are examined, it is apparent that attendance zones have been drawn in a nondiscriminatory manner. The attendance zones were initially patterned upon recommendations by a team of desegregation experts made available by the United States government. Over the years, the changes in the plans

have been reviewed and approved by OCR. The evidence indicates that, for the most part, each time a change has been made, such change aided in further desegregating the particular unit or units involved. This record of continued improvement, combined with the relatively high levels of desegregation actually achieved, leads the court to conclude that the CCSD has desegregated its schools with regard to student assignment. As set forth in this order, the racial balances in the schools approximate the overall racial balance within their respective Constituent Districts. The evidence indicates, since the desegregation plans were implemented in 1970–71, the racial makeup at the great majority of the schools has been within twenty percentage points of the racial makeup of the Constituent District in which the schools are located. This guideline, which permits an overall acceptable range of 40 percentage points, was adopted by the court in *Adams v. Weinberger*, 391 F.Supp. 269 (D.D.C. 1975), and subsequently applied to the CCSD by OCR. It has been utilized by the courts in other school desegregation cases, and this court finds its use appropriate here. See *Diaz v. San Jose Unified School Dist.*, 633 F.Supp. 808, 814 (N.D. Cal.1985); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1238 (2d Cir.1987). *See also, Armstrong v. Bd. of School Directors of Milwaukee*, 471 F.Supp. 800, 807 (E.D.Wis.1979), *aff'd*, 616 F.2d 305 (7th Cir. 1980) (35%–40% range approved); *Arthur v. Nyquist*, 566 F.Supp. 511, 514 (W.D.N.Y. 1983) (35% range approved); *Vaughns v. Board of Educ. of Prince George's County*, 574 F.Supp. 1280, 1375 (D.Md.1983), *aff'd in part, rev'd in part on other grounds*, 758 F.2d 983 (4th Cir.1985).

While the great majority of Charleston County schools have met this guideline over the years, a few have not. However,

---

**11.** Indeed, at trial plaintiffs did not deem such alleged "disparities" significant enough to mention, even in response to a direct question by the court as to whether either of the Plaintiffs contended that the Constituent Districts were not fully desegregated within their respective boundaries. TR, day 15, pp. 41–42.

**12.** Neither plaintiff-intervenors nor the United States have alleged or introduced any evidence of discrimination in extracurricular activities or transportation.

the court has examined each of these schools and is persuaded by the evidence that those few schools which differ substantially from the overall racial balance in their Constituent Districts differ for demographic reasons or for reasons other than government imposed segregation. (See pages 1521–23.)

In any event, the courts have made it clear that while "[a]wareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations," *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971), "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." 402 U.S. at 24, 91 S.Ct. at 1280. Merely because one or more of the schools in a Constituent District may be predominately black does not prevent the district from being desegregated if the available pool of students within that district has not been discriminatorily assigned to schools on the basis of race.

As previously noted, the existence of predominately black schools in Districts 1, 20 and 23 is not evidence of "present segregation". Such schools are predominately black because the student enrollment in the Constituent Districts in which they are located is predominately black, and not because of any intent by the Constituent District Board or CCSD to assign students to either retain the racial character of a school or designate it anew as a "black" or "white" school. In each of these Constituent Districts, by all accounts, the dual school system was clearly dismantled in the early 1970s. In District 20, the dual school system was dismantled pursuant to court order. The majority of the current District 20 schools were historically white schools (*i.e.*, Rivers, Simons, Courtenay, Memminger, Rhett), and none of them retain their racial identity as "white" schools. After being integrated in the early 1970s, they rapidly became predominately black due to demographic changes in the district and "white flight" to private schools, but such resegregation cannot be attributed to the former dual school system. Buist was historically white, then became black, then closed, and now has reopened as an integrated magnet school. While the three historically black schools—(Burke, Sanders–Clyde and Fraser)—are still predominately black, they remain black because the student enrollment of District 20 is predominately black, and not because District 20 has failed to more effectively desegregate them. Certainly no one can argue that the District 20 assignment policies have led to this situation or that these schools could have been more effectively integrated if the remaining white students in District 20 had been parceled out among them.

Districts 1 and 23 also dismantled their dual school systems in 1970 and 1971 under OCR supervision. At present, all District 1 elementary school children, black and white, attend St. James–Santee Elementary School, a new school opened in 1983. It was not a part of the dual school system. This school is approximately 88% black because the population of District 1 is predominately black, and not because vestiges of the dual school system remain or because of that Constituent District's assignment policies. District 1 high and junior high schools were desegregated in 1969, when the white high school was closed and all students, black and white, were assigned to Lincoln High, the former all black high school. Although Lincoln High remains predominately black, this situation is due to a predominately black population and the fact that the white students in District 1 have left the public schools; there is no evidence of discriminatory assignment policies.

In District 23, a number of historically black elementary schools are still predominately black. However, once again, this is not the result of District 23's assignment policies, but it is the result of a predominately black student enrollment in District 23. It is clear that, given the small number of white students enrolled in District 23 schools, the District 23 Board could not

have assigned its students in a more desegregative manner.

In summary, although predominately black schools remain in Charleston County, the court concludes that such schools are predominately black because the racial makeup of that particular Constituent District is predominately black, and white parents residing in that Constituent District have enrolled their children in private schools. These schools are not predominately black because of any failure by the Constituent Districts to assign available students in a more desegregative manner, or because black and white students have been assigned within such districts so as to concentrate blacks in some schools, and whites in other schools. These demographic and parental choice factors are not the fault of the CCSD or the Constituent Districts. As stated by the Fourth Circuit in the *Goldsboro* case:

> The plaintiff's problem is the result of movement from city to suburbs seen throughout the United States and the abandonment of public schools by white, city residents seen in many communities where desegregation has occurred. *We are not at present charged with a responsibility to remedy problems caused by demography and private racism.*

745 F.2d at 333 (emphasis added). Similarly, in *Mapp v. Board of Educ. of the City of Chattanooga, Tenn.,* 525 F.2d 169 (6th Cir.1975), the district court had approved a desegregation plan based on geographic zones which, according to student residence data, would have desegregated the district's high schools. However, the white children failed to show up at two of the high schools, leaving each 99% black. Nevertheless, the Court of Appeals affirmed the district court's order, finding that the racial composition of the two schools was "due to a substantial depar-

ture of white students from the public schools in Chattanooga, a circumstance which the district judge found to have occurred beyond the control and responsibility of the School Board." *Id.* at 171.[13]

### 2. *Faculty Hiring and Assignment*

In determining whether a school district has desegregated its schools with respect to faculty, the courts have long been guided by *Singleton v. Jackson Mun. Separate School Dist.,* 419 F.2d 1211 (5th Cir.1970). In *Singleton,* the court held that a school district's faculty would be considered desegregated if teachers and staff were assigned so that the ratio of black and white teachers at each school was substantially the same as the overall ratio of black and white teachers in the district. The Fourth Circuit has expressly adopted an identical rule which is applicable in this case. See *Brewer v. School Bd. of City of Norfolk, Va.,* 434 F.2d 408 (4th Cir.1970), *cert. denied,* 399 U.S. 929, 90 S.Ct. 2247, 26 L.Ed.2d 796 (1970); *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 431 F.2d 138 (4th Cir.1970) *aff'd in part,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. School Bd. of City of Roanoke, Va.,* 428 F.2d 811 (4th Cir.1970); *United States v. School Bd. of Franklin City, Va.,* 428 F.2d 373 (4th Cir.1970); *Nesbit v. Statesville City Bd. of Educ.,* 418 F.2d 1040 (4th Cir. 1969).

As discussed above, the court has concluded that the *Singleton* rule should be applied on a Constituent District basis in this case. Section 6 of Act 340 specifically vests the authority to hire teachers to staff the schools within each Constituent District in the respective Constituent District Board of Trustees. *See, Wrixon v. School Dist. of Charleston County,* 85–MO–042 (S.C. App. July 26, 1985); CCSD Ex. 60. An interpretation which would permit the Con-

---

**13.** Districts 2, 3, 4 and 10 are completely integrated within their respective boundaries because there are enough whites within those districts to do so. Every high and middle school in these allegedly "white" districts has a black enrollment of at least 25 percent. Of the 29 elementary schools in these districts, all but Sullivan's Island Elementary have substantial black enrollments. This conversion from a dual to a

unitary system is perhaps best exemplified by what has occurred at St. Andrew's High and North Charleston High, the historically white high schools in districts 10 and 4. Both are now majority black, although both have a substantial percentage of white students; thus, where geography, demographics and mixed population patterns permit, the public schools have been integrated.

stituent District Boards to hire the teachers, but would permit the CCSD to assign them to another Constituent District, would render sections 6 and 8 of Act 340 meaningless, and for that reason the court declines to so interpret the Act.

After examining the evidence on teacher hiring and assignment, the court concludes that teachers have been assigned so that the ratio of black and white teachers at each school is substantially the same as the ratio of black and white teachers in their respective Constituent Districts. The evidence reveals that the faculty of the majority of the schools in the CCSD has been within ±10% of the percentage of black and white teachers in the respective Constituent Districts since 1970. At the present time, only three schools out of 67 fail to meet the ±10% standard used by Dr. Armor in his analysis and relied upon by other courts in applying the *Singleton* rule. *See, United States v. Texas Educ. Agency,* 679 F.2d 1104 (5th Cir.1982); *Board of Ed. of Oklahoma City Pub. Schools v. Dowell,* 375 F.2d 158 (10th Cir. 1967), *cert. denied* 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967). The court concludes that these few exceptions do not indicate any pattern of discrimination in the hiring and assignment practices of the Constituent Districts. There is no evidence in this case that blacks are underhired or victims of discrimination in the recruiting or hiring processes. While the evidence indicates that it is increasingly difficult to hire qualified black teachers, the evidence also indicates that this is a nationwide problem and that, notwithstanding such problem, black teachers are well represented in the CCSD. The court further concludes that, since hiring is properly handled on a Constituent District basis, there is no requirement that faculty be balanced between Constituent Districts or that an affirmative action plan be adopted by CCSD to bring about that result.

### 3. *Facilities*

While some evidence has been introduced regarding particular problems with facilities in predominately black schools, it does not indicate any discrimination in this area.

Several witnesses complained about leaking roofs and the size of the cafeteria at Burke High School, but no evidence was introduced to show discriminatory policies against predominately black schools in terms of facilities, or that other schools did not suffer from similar problems, such as roof leaks. In fact, the evidence indicates otherwise. Witnesses testified that Burke High School was possibly the best high school facility in the CCSD, and that roof leaks are a prevalent problem in many schools, regardless of the racial makeup of their student bodies. No one disputed this testimony. The court confirmed the accuracy of this testimony by personal visits to approximately 10 schools with various racial balances, including Burke High School. Such testimony was further supported by an analysis of bond expenditures on capital building projects since 1968, which analysis revealed almost 50% more spending, on a per student basis, in the four predominately black Constituent Districts (Districts 1, 9, 20 and 23) than in the majority white Constituent Districts (Districts 2, 3, 4 and 10). While much of this was undoubtedly due to greater needs in those districts, these substantial spending differentials in the last 20 years rebut any inference that the CCSD is discriminating against predominately black schools, the majority of which are located in these four districts. The court thus concludes that facilities are being provided on a nondiscriminatory basis.

### 4. *Resource Allocation*

While black schools were not afforded their fair share of resources in the years prior to desegregation, there was no evidence introduced at trial which indicates that such discrimination continued into the 1970s and 1980s after the OCR-approved desegregation plans were implemented. In recent years, predominately black schools have, if anything, received slightly more funding on a per capita basis, and substantially more funding if funds from federal programs are included. Therefore, if there has been any disparity in the allocation of resources, it has been to assist predominately black schools with special needs and not to discriminate against students in predominately black schools.

There is, of course, a higher allocation of resources to the three magnet schools, two of which are 60% white and 40% black—(Buist Academy and Ashley River Elementary)—and one of which is majority black (Jennie Moore Elementary). However, these are special programs designed to promote integration in the school system, and the higher allocation of resources to them cannot be considered an index of discrimination. Therefore, the court concludes that resources are being allocated by the CCSD on a nondiscriminatory basis.

## VII. INTERPRETATION OF ACT 340

### A. GENERALLY

Plaintiffs contend that the CCSD has liberally construed the provisions of Act 340 in instances in which the CCSD wished to exert its authority over matters unrelated to desegregation, but has given the Act a restrictive interpretation on matters relating to desegregation. The court does not agree with this contention. The court finds that the CCSD's interpretation of both Act 340 and general state law has been consistent with the language and intent of Act 340. Moreover, the court does not agree that CCSD has always taken a restrictive view of the Act to avoid further desegregation.

For example, in 1984, it attempted to interpret Act 340 to give the CCSD more authority over teacher assignment. In *Wrixon v. The School Dist. of Charleston County,* No. 85–MO–042, (S.C.App. July 26, 1985), CCSD Ex. 60, the Constituent District 2 Board brought suit asserting that implicit in the power to hire faculty, vested in Constituent Boards by Section 6 of Act 340, is the power to assign teachers and faculty to duties such as extracurricular activities.[14] The CCSD, relying on the general law as found in S.C. Code Ann. § 59–25–410, asserted that such power to assign faculty was delegated to it. The South Carolina Court of Appeals rejected the CCSD's interpretation and found that the power to assign faculty was essentially

an employement decision and, as such, lay in the hands of the Constituent Districts by virtue of Section 6 of Act 340. *Wrixon v. The School Dist. of Charleston County,* CCSD Ex. 60, at p. 3. Likewise, in the matter of Buist Academy, the CCSD Board strived, often at odds with a Constituent District Board which zealously protected its authority to make student assignments in its district, to establish an integrated school in District 20. Thus, while the CCSD has not always sought to interpret Act 340 as plaintiffs would have wished, the court finds no evidence of a pattern or practice of interpreting the Act in one manner when it pertains to matters unrelated to desegregation and in another manner for matters related to desegregation.

### B. IN THE MATTER OF STUDENT ASSIGNMENTS

■ The CCSD has consistently interpreted Section 7 of Act 340 as vesting the Constituent District Boards of Trustees with the authority to determine the schools within their respective districts which the children residing in such districts should attend. Such interpretation was in accordance with an opinion obtained by the CCSD from the South Carolina Attorney General's Office shortly after the passage of Act 340.

However, the plaintiffs contend that this is a restrictive interpretation not required by the literal terms of Act 340 and that such interpretation is intended to preserve racial imbalances between the Constituent Districts. However, while the court agrees that the actual words of Section 7 of Act 340 do not expressly refer to children residing in the Constituent District when it confers upon the Constituent District Board the authority to "determine the school ... in which any pupil shall enroll," that is unquestionably the intent of Section 7. Indeed, even the plaintiffs contend that the intent of the General Assembly in enacting Section 7 was to require assignment of children to schools in the Constituent Dis-

---

**14.** *Wrixon* involved the assignment of a high school football coach to be athletic director. The coach, against the wishes of the Constituent District's Board, was assigned by the school prinicpal to such duties. As a result the Constituent District filed suit.

trict in which they lived. Therefore, consistent with such legislative intent, the court concludes that Section 7 of Act 340 should be interpreted to confer on the Boards of Trustees of the Constituent Districts the authority to assign students residing within their respective Constituent Districts. It is well settled that the intent of the legislature must prevail in construing a statute. *Newman v. Vessel Lady Arnnette*, 470 F.Supp. 520 (D.S.C.1979); *State v. Salmon*, 279 S.C. 344, 306 S.E.2d 620 (1983); *Adams v. Clarendon County School Dist. No. 2*, 270 S.C. 266, 241 S.E.2d 897 (1978).

The fact that the language of Section 7 tracks verbatim the language of the general state law relating to a school district's authority to assign students also indicates that the General Assembly intended that Constituent District Boards have the same powers within the territory under their control. Under general state law existing in 1967, a child attended public school in the school district in which the child resided with his or her parent or legal guardian or in which that child owned real estate having an assessed value of three hundred dollars or more. § 21–752.1 of the Code of Laws of South Carolina, 1962, (now codified as § 59–63–30 of the 1976 Code). These would be the students the school district trustees had to assign to schools pursuant to § 21–230(9) of the Code of Laws of South Carolina, 1962, which is now codified as § 59–19–90(9) of the 1976 Code. It is presumed that the General Assembly is familiar with prior legislation on the same subject when it passes new legislation. *Bell v. South Carolina State Highway Dep't*, 204 S.C. 462, 30 S.E.2d 65 (1944), *rev'd on other grounds*, 285 S.C. 243, 329 S.E.2d 741 (1985). Therefore, in 1967, the General Assembly, aware that school district trustees by law assigned only those students who lived in their districts to schools within their district, must have intended that the Constituent Boards of Trustees have the same power or it would not have used precisely the same language to define the power of the Constituent District Boards over student assignments. The court finds no evidence

that this interpretation, which is consistent with both the legislative intent and common sense, is a pretext used by the CCSD for discriminatory purposes. Indeed, it appears that no one, including the OCR or the parties themselves, ever suggested that a different interpretation of Act 340 might be possible until after the trial of this case was underway.

## C. IN THE MATTER OF STUDENT TRANSFERS

Act 340 is silent concerning whether and how a pupil residing in a Constituent District can transfer to another Constituent District. Under the general law of South Carolina there is a procedure for a student in one school district to transfer to an adjoining district if the student can be better accommodated in that district. §§ 59–63–490 to 59–63–510 of the Code of Laws of South Carolina, 1976. (The identical procedures were codified as §§ 21–849 to 21–851 of the 1962 Code at the time of Act 340.) Pursuant to § 59–63–490, the board of trustees of the school district in which the student resides may transfer that student to an adjoining district if the receiving school district consents. The County Board's only role in the transfer procedure is as an appellate body when the receiving district refuses to give its consent to the transfer, and the County Board decides only if the refusal was unreasonable or arbitrary. § 59–63–510 of the Code of Laws of South Carolina, 1976. *See* 1964–65 Ops. Att'y Gen., No. 1840, p. 95. (County Board had no authority to order initially a transfer of a student from one school district to another. It acts only as an appellate body.)

■ It is the general rule throughout the United States that students cannot attend school in school districts in which they do not reside unless there is express statutory authority therefor. Many jurisdictions have statutes, similar to South Carolina, providing for the transfer of pupils from their resident district to an adjoining district, subject to certain conditions and restrictions. In order to transfer, a pupil must meet the conditions of the statutory

provision. 68 Am.Jur.2d *Schools* § 223; 79 C.J.S. *Schools and School Districts* § 451.

The Constituent Districts and CCSD have consistently followed the general state law as to transfers between Constituent Districts. The South Carolina Attorney General's Office has determined that this is the correct procedure for such transfers under Act 340. In 1976–77 Op. Att'y Gen., No. 77–272, the Attorney General's Office applied the rule of statutory construction that where there exists an ambiguity or hiatus between the general law and the local law, the statutes should be construed in harmony with one another where this will not do violence to the legislative intent, and concluded that:

> Where, on one hand, the Legislature has undertaken through the 1967 Act ... to create special administrative constituent districts within Charleston County which have the power to direct student transfers within constituent districts, as would a district board of trustees under general law; and, where under general law, it is recognized that inter-district transfers should be permitted under certain limited circumstances, it is the opinion of this Office that the general and local law should be construed so as to provide a procedure for approval or disapproval of the transfers between adjoining constituent districts in Charleston County that accords with the procedures for student transfers between adjoining school districts operating under general law. See *S.C.Code Annotated,* § 59–63–490 and § 59–63–510 (1976).

*Id.* at 5. The Opinion emphasized that the role of the Board of Trustees of CCSD was an appellate one as was the role of county boards under the general law concerning interdistrict transfers. The Opinion stated that "unless an appeal is taken from an adverse decision of the constituent districts, *the Board of Trustees of Charleston County has no authority to authorize or disapprove a transfer between adjacent constituent districts." Id.* at 7. (emphasis added).

## VIII. THE BUDGET AND CONTROL BOARD IS NOT A PROPER DEFENDANT IN THIS ACTION.

The South Carolina State Board of Education and the Office of the Superintendent of Education, are the state level offices established by the State Constitution for administration of public education in this state. Art. 11, §§ 1 and 2; §§ 59–3–30 and 59–5–60 of the Code of Laws of South Carolina, 1976. The various duties of the Budget and Control Board do not extend to the supervision of the State Board of Education or the educational system of this state. *See* § 11–11–10 *et seq.* of the Code of Laws of South Carolina, 1976. Consequently, the Budget and Control Board had no responsibility for any of the alleged conduct in this action.

## CONCLUSION

In this case, we do not start from a *de jure* segregated system. Despite plaintiffs' argument to the contrary, the eight constituent districts, with boundaries identical to what they are today, existed well before 1967 and, in fact, all of them had passed reviews by the Office of Civil Rights. In the eight school districts—(predecessors to the constituent districts)—segregation has been eliminated to the extent that it can be—therefore *Brown* is not implicated.

In conclusion,[15] the court finds that to the extent Act 340 changed the educational organization of Charleston County, its changes were beneficial, especially to the rural, predominately black areas of the County. The primary complaint of plaintiffs is that Act 340 did not make more substantial changes. The General Assembly, however, was under *no duty* to change the existing school system to provide for more centralized teacher hiring and more centralized control over student assignments. Although they were under no af-

---

**15.** This court concedes, having decided that the Constituent Districts constitute the lines to be considered in determining student and teacher assignments, that it is written at great length to explain why the plaintiffs do not contest the fact that each Constituent District is truly desegregated and constitutes, in itself, a unitary school system.

**1544**

firmative duty to change the existing system, this court does find that if the Act had effected wholesale changes in attendance zones, a slightly more integrated school system could have resulted. Since, the General Assembly was not required to further expand their changes in the CCSD under the constitutional mandate of *Brown,* this court finds that the defendants have fulfilled their duty to eliminate the dual school system that existed in Charleston County prior to 1954. Based on the foregoing, it is

ORDERED, that within the Charleston County School District there is, and has been, a unitary school system;

FURTHER ORDERED, that this action shall be dismissed and the Clerk shall enter final judgment for the defendants;

FURTHER ORDERED, that each side shall pay their own costs of this action.